Virginia Keeney on behalf of the plaintiffs and appellants, many of whom are in the courtroom with us today. Your Honors, this case poses a simple question, which harkens back to similar questions raised 50 years ago at the outset of the Cold War, whether the government can impose an onerous background investigation and suitability of determination on low-risk personnel simply by raising the specter of national security without justifying the need for the investigation or narrowly tailoring its scope. I would like to address three issues during my opening remarks and reserve five minutes. The key issues before the court are, first, the defendant's contention that none of the information at issue here is protected by the U.S. Constitution. Second, whether the government has met its burden on the record before the court. And finally, the balance of hardships. Turning first to the issue of whether the information is constitutionally protected, it is our position that it is, both by the informational privacy rights, which have been recognized by this circuit, as well as by the Fourth Amendment. All right, so I think we have several different things we're talking about here. We have the actual standard Form 85, and then we have the waiver that's contained within it, and then we have the statute of limitations, and then we have the subsequent, I guess, questions and investigations. And part of this the district court held was not right. So shouldn't we examine whether or not each of these claims is right before we start? Certainly, I can address that, Your Honor. I think there really are sort of four parts to the investigation. One is that the decision to complete Form 85 was right for review, and we believe that that was the correct decision. All of the plaintiffs have been told that if they do not fill out Form 85, as well as all JPL employees who are low-risk, they will be terminated, deemed to have resigned from JPL, in effect terminated.  And two, the waiver that they must sign is part of Form 85. And so if they do not sign the waiver without any amendment, they also will be deemed to have resigned their employment from JPL. There also is a form, I believe it's Form 42, which is part of the investigation process, which requires that they disclose the names of three close associates who will be given a document that asks them to provide information about, for example, the mental and emotional stability of the person, their financial integrity, et cetera. And then finally there is the suitability determination. I'm not sure the district court dealt with Form 42 as to whether or not that was right for review or not, but the court did find that the suitability determination was not yet right. And it is our position that the entire background investigation is right. It is the only reason the government is asking people to fill out Form 85 and gathering the information from all of the sources that Form 85 can be directed to, questioning associates, is to gather information to make a suitability determination. And every one of the plaintiffs have been told that they must pass the suitability determination to receive their badge and remain employed at JPL. But do you have any evidence of anybody being injured by not receiving a suitability determination? I'm sorry, I just didn't... So has anybody been injured, any JPL employee been injured? There is nothing in the record to indicate that anyone has been denied based on a suitability determination at this point. The injury, though, that is present and that all of them face is that, and this was acknowledged by Supreme Court cases, and the one I cited too, was the Cayetian versus the State of New York case, that by a government entity implementing these types of suitability determinations, even if they have not yet come into effect, and in that case, the single thing that the plaintiffs had been asked to do, which was to sign a document saying that they were not members of the Communist Party, that document had been yanked by the State of New York and no longer was in use. Nonetheless, the Supreme Court said the entire framework, regulatory framework, that required state teachers to be evaluated for whether or not they were associating with subversive organizations was not moot and was ripe for review. So we would submit that this is a situation where the injury is imminent, namely that they will be required to be assessed for suitability based on information gathered about them, and the suitability matrix that is part of the record, this is the document that lists a host of vague and impermissible criteria, this is the criteria they were told they would be judged by, the government has never disavowed that this is the criteria that they are being judged by. And in fact, in their opposition papers, the government goes so far as to say that certainly they intend to evaluate people for mental health issues and for uncharged crimes. Those are some of the suitability criteria that we are challenging here. So I hope I've answered your question, Your Honor. I would also, on the issue of ripeness, though, I would also. Scalia. Can you frame the ripeness question? Well. What is the issue? Well, as I see it, is the investigative and suitability determination scheme that is currently in effect and to be applied to all JPL employees ripe for review. What makes it ripe for review? That it is undisputed that they have this scheme in place. It is going, every one of the plaintiffs is going to be subjected to it imminently, and the only reason they have not been subject to it is because a temporary preliminary injunction was issued, and the, and they will be terminated if they are determined to be unsuitable based on those criteria. So I don't think the case, in fact, is different than Leduc v. Nelson, which is, you know, a Ninth Circuit case which is on point, where because there was a admitted government practice of conducting certain types of migrant labor sweeps, even though there was no evidence that the particular plaintiffs would be caught up in such a search or sweep, because there was a practice that was going to be put into effect, was imminent, you know, the government acknowledged that this was their practice. It was found to be permissible for the individual plaintiffs in that case to challenge whether the entire search practice there was constitutional or not. Don't go on as far as I'm concerned beyond that. Thank you, Your Honor. Just one quick question on the Form 42. Is the Form 42 just the form that follows up on the Form 85 information that the government then sends to the references? Well, the Form 42 is what is sent to the close associates, the three people that are listed. The three people. So it's really part of the Form 85. If you're going to look at this in discrete ways, it would be the Form 85 waiver, and Form 42, and then suitability. Yes. Though we would argue that it really needs to be a document. I know what your argument is. Thank you.  government a blanket waiver that they can use to obtain any information from any source for a two-year period, even after they've left JPL. And this gives the government the ability to obtain private information from prior employers, from retail establishments, from credit agencies, and past schools. The defendants argue that this waiver will not be used to obtain medical records, but the waiver does not so state. The government also argues that the waiver will be used to just confirm past employment records, past employment history, but the waiver is not so limited. In fact, the waiver permits the government to not only confirm dates of employment, which is completely reasonable, but also to obtain personnel files. And personnel files inevitably contain medical information, often family information, financial information, pension information, often personnel matters that have nothing to do with job performance. Nonetheless, the government, with this waiver, can collect and maintain indefinitely those records. Contrary to defendants' position, all of this information falls within the zone of privacy protected by the Constitution. In this circuit, the court has held that Social Security numbers fall within the zone of privacy, recognizing that the zone extends beyond procreation and sexual matters, as defendants argue. The expectation of privacy in past employment records and in financial information has also been recognized as protected by the Second Circuit in Berry v. City of New York and by the Fifth Circuit in Plank v. Gonzalez. Defendant alternatively argues that there really is no expectation of privacy because there are adequate safeguards to protect the information here. And this argument fails really for two reasons. The first is that the case law is clear that requiring someone to divulge information to the government, standing alone, regardless of whether or not that information  Is it clear whether those investigations will actually take place? The government says what about that? I'm sorry, I just didn't hear you, Your Honor. Is it clear that the investigation, which would follow the waiver, would actually take place? The government apparently says that there's no showing that they would actually do that. Is that right? Well, I don't think that's right. They've said that they, in their papers, that they intend to follow up on all leads, that they intend to request information using the information, and that they've deliberately made it very broad in its reach because they want to be able to follow up on all information. I believe that's in their opposition brief at this court, and I think it's also in the transcript at the hearing below. So they certainly have indicated that they're not just getting this waiver to put it in the circular file, but actually to use it to obtain far-reaching information on JPL employees. Now, the case law in this circuit, Thorne v. El Segundo, and also the Tucson Women's Clinic case, both clearly hold that merely requiring an individual to give information to the government is alone sufficient to trigger privacy rights. There doesn't have to be a showing that the government is going to then provide this information to third parties. And I would point out that on Form 85 itself, in fine print on the second page, the form informs plaintiffs that the information can be provided, and I'm quoting here, to the news media, the general public, the National Archives, to any public authority if the record indicates a potential violation of law, criminal or regulatory, and to any court when the U.S. is a party. So in other words, in this very litigation, if this had already been in effect, the defendants could, where the U.S. government is a defendant, they could submit the plaintiff's personnel records or records that they've gained through Form 85 to perhaps discredit them or try to discredit them before this court. Turning to Form 85 itself, many of the questions on the form obviously pose no problem for the plaintiffs. Requiring that they list past employers, past schools, plaintiffs have no objection to that, and that's not what's at issue here. What Form 85 does require, though, in Question No. 14 is that they disclose drug use and any counseling they may have received for drug use. And the ‑‑ this raises a serious concern under the Fourth Amendment and under the informational privacy law. The defendants claim that there is no Fourth Amendment problem posed by this question, but Katz v. United States clearly announced that there doesn't have to be a physical invasion of the person or of their property for there to be a Fourth Amendment violation. The Fourth Amendment protects the person, not the place. Suppose we were to disagree with you on your Fourth Amendment claim. You have other constitutional violations that you assert, Fifth and Sixth Amendment, I believe. Well, the ‑‑ you're right in that the Fourth Amendment claim, if this court were to find that it does not rise to the level of a search and seizure, the informational privacy claim, which is grounded in other amendments, goes to the same place and provides the same protections. That's what I thought. And that the government has to meet the same burden, whether it's under a Fourth Amendment analysis or an informational privacy analysis. Okay. And just to respond to you as well, there is a Fifth Amendment allegation pled, and though not pled, certainly the First Amendment and due process claims are sort of incorporated into the informational privacy analysis of many courts. And I don't want to go into that thicket unless the court wants me to. All right. Don't hurt me. You're doing a good job. I don't want to interfere with you. Just keep it up. Okay. So a last question. So assuming you have the informational privacy claim under Crawford, the government has said that it has a legitimate governmental interest in obtaining this information, and it cites to the HSPD and the Space Act, and it argues that its actions are narrowly tailored to those purposes. So how do you respond to that? Let me respond to that. The record is incredibly thin in justifying the investigation and suitability determination here. The defendants have submitted the declaration of their head of security, Randy Aiden, but what Mr. Aiden proceeds to say to justify this entire investigation is that these low-risk employees may get near the outside of buildings where sensitive or classified material work is in progress. Mr. Aiden admits that none of these low-risk employees can get access to those buildings. That requires a whole different level of security clearance that's not at issue here and is not being contested. So the standard that he is using to justify this type of background investigation is merely being near the outside of a building where sensitive programs are going on. And we would suggest that if that was the standard, no one could get near or into the federal building in West L.A. or perhaps even into this court because these are federal buildings and these are buildings in which sensitive things also are performed  If questions are asked of third parties, they're not compelled to answer, are they? And as the inquiries go out to the third parties, they can answer or not answer. We don't know whether they would want to answer or not. Is there a violation of the plaintiff's informational privacy claim under those circumstances? Well, you're right that there is no compulsion other than perhaps the compulsion that comes from receiving something from the federal government asking you to provide information. But someone can decline to respond. So there would be no protection of the plaintiffs against those answers? Well, they are compelled to provide information to the government that the government can then use to get information from third parties. So they are giving to the government the thing that is critical for the government's investigation. The names of these issues. The connective link is the fact that the plaintiffs have to supply those references so the questions can be asked even though the people who might be asked may or may not answer. And if they do answer, it doesn't violate the informational privacy claim in and of itself. Is that right? Well, yes. I think the compulsion on the plaintiffs is the link that makes it a violation of informational privacy. The case of Parker v. Lester, which we've cited, which is an old Ninth Circuit case about suitability determinations for, I think, merchant seamen, you know, it addresses, it found the entire suitability determination process unconstitutional because the government was asking their associates for confidential information about the seamen and then using it to disqualify them. So I don't know if I could articulate here whether it's a violation of informational privacy rights to send these requests out to third parties for them to comment on the mental health of the plaintiff. But it does raise constitutional concerns under some of these earlier case laws, case law. I guess what partly troubles me is that there's no compulsion to answer, but it would seem that the questionnaire is so broad, it asks them, well, do you know of any other adverse information about this person that you would get perhaps some eager people who might have something against, one of the people who's being questioned about, who might be excited to fill out the form and get in their jab at someone. Well, certainly there have been, you know, notorious instances of that happening where people have provided, you know, negative information to damage the careers of scientists. And it certainly, I mean, one would assume that some people are going to respond to these form 42s and are going to supply information because the government is asking and because they feel that they are duty-bound to answer truthfully. And it may be to provide rumor and innuendo that they've picked up about the person. But turning back to the question about the government's justification, one justification is that they're going to be near the outside of buildings. The other justification is that they need to find out about criminal activity charged or uncharged. But if you look at Form 85 and if you look at Form 42, which is given to friends, there's very little in there that has anything to do with criminal activity. I mean, the one question not posed to the neighbors is, do you know of any criminal activity they're engaged in? So there's no fit between the government's expressed need and the investigation. And I would also point out that all of the plaintiffs have gone through the national agency check. So they've all been fingerprinted already. No. No. The national agency check that they've all been submitted to requires that all federal databases, criminal databases, are checked for their names. I don't know exactly how that works, but the concept is that there will be efforts through data already collected from law enforcement to determine whether they have arrests or criminal records. So what's different here is the national agency check with inquiries, and that is the waiver and request to provide background information and the questions to associates, and then the suitability determination, which none of them have been required to undergo previously. So they're not currently required to get fingerprints. As part of the badging process that's at issue before the court is fingerprinting. And so one of the things they will have to do to get this badge, which we haven't really raised, is be fingerprinted and submit two other forms of ID. Well, I guess my question, what I'm thinking, is that if one of the legitimate government interests is to check for criminal activity, that getting fingerprints might be a more narrowly tailored way to meet that objective. Let me comment on that. Prior to the system that we're challenging, NASA did implement the OneNASA badge, and that was to respond to HSPD-12. And that process, many of the plaintiffs have gone through, and they have OneNASA badges. And for those badges, they were fingerprinted. And we have not raised an objection to the fingerprinting process, which does legitimate identification. Where does Caltech fit in? I think Caltech will explain how they fit in, but our perspective is they are. . . Apparently you believe they do. Excuse me? You think they do, and they think they don't. Well, yes, I think they do because, and the government makes this point as well in its papers, they have made the decision that anyone who doesn't have a badge will be terminated. The government is only requiring that if you don't have a badge, you're barred from the JPL premises. But these people are Caltech employees, and it is Caltech that has decided that they'll be terminated. The government is enjoined. Why does Caltech have to be enjoined? They have to be enjoined because they are. . . Though I think that Caltech would probably, I believe, in good faith, would follow the injunction, there is nothing that says that they have to, and they could still, I guess, require that those who did not fill it out within a certain time period be deemed to have resigned. They are linked in the enforcement of the system. Now, they objected to this change in their contract, so why would they then want to go along with this if the government was enjoined? Well, again, I don't want to impugn Caltech's activities here. You don't want to enjoin Caltech? I want to enjoin Caltech, but I want to enjoin them because I think they are the active. . . They are an active party in the whole implementation scheme, and they are the ones who elected to terminate individuals. They could as easily have transferred them to another facility, permitted them to work on Caltech's campus, given them six months to find new employment elsewhere. They have not been a passive participant. They have actually added up the ante by deciding that it's an immediate termination as a consequence. I'd like to. . . Well, I don't have much time to preserve it all, so I'll just finish, I guess. The final justification that they give is that they need to inquire about the mental health of people who are going to be working on sensitive projects. And, again, this type of unrestricted questioning clearly would violate the ADA, which they need to comply with, which prohibits, you know, pre-offer questioning of this type and severely restricts post-employment questioning about anyone's mental or medical health. So one of their primary justifications for asking these questions of associates is an illegal question under the ADA. All right. Thank you very much. Thank you very much. Thank you. Now I presume that NASA and Caltech has divided its time. Yes, Your Honor, I'm Mark Stern from the Justice Department, and we'll be arguing separately from Caltech JPL. Right, but you're going to take up how many of the 25 minutes? Eighteen or nineteen, but the 18 minutes. All right. May it please the Court. I think it's important to focus on what's actually at issue on this appeal from a denial of a preliminary injunction and exactly what the claimed irreparable harm are and exactly what the constitutional basis for that harm are. There's been a lot of speculation about what the government might do. Now, it looks like the presidential directive is directed at identity only. How do you get off into this background investigation about what people have done in the past or some misdeeds that they've done, other than identifying them? Is that right? Well, Your Honor, I think that we'd go through it. Don't we just want to know who they are and that they are who they say they are? Well, the short answer is no, Your Honor. That isn't at all what the question is. That's the way the presidential directive looked, if you read it. Well, Your Honor, the presidential directive started a process under the FSMA, and what that did was it went to the Department of Commerce and— Now, you've got to look, though, to some authorization, likely through statute, and you're looking at the Space Act and the presidential directive. Isn't that right? Well, Your Honor— You're developing regulations based on that proposition. Your Honor, the FSMA vests the Secretary of Commerce with the authority to adopt recommendations from the National Institutes of Standards and Technology, which is what happened here. The Federal Acquisitions Regulations Council— You look at your basic authority to do what you're doing. Well, Your Honor, there is no one— You look at the presidential directive and the Space Act. Isn't that where this— No, Your Honor, that's not correct. With respect, the FSMA is itself a statutory authority, so what the president did in the directive says, the 9-11 Commission, among many other things, pointed out a discrepancy between the way that government contract employees and federal employees are given access to both physical and sort of logical, in the sense of just broader information facilities, and what the purpose of this at the end. And it goes through various sources of authority on this. But what it does in the end, and notwithstanding all of the rhetoric about what an extraordinary thing this is, all that has happened is that the contract employees are filling out the same form that every competitive civil service employee of the United States fills out. So when there's statements about, well, under the government's logic, who could come and work in the courthouse? Well, the answer is that people in the competitive civil service who work in the courthouse do fill out this form. It's—this has been something that's been going on for decades. But you're saying that the people who work in this courthouse fill out this form? Competitive civil service? I mean, I don't know exactly who works— I don't know of anybody who works in this courthouse who's filled out this form. Well, Your Honor, the—we detail in— But, Your Honor, there is the—I mean, there are the—there is the accepted civil service. There are—I mean, there are different categories of the civil service. I'm not sure we even have civil service here. So— Excuse me, Your Honor. I said I'm not even sure what category our employees fall within. But I know that nobody in this courthouse fills out this form. Well, Your Honor, we cite the—like the places in which this is set out as the requirement. It's noted in the—in the publication in the Commerce Department FIPS publication as the minimum standard. But, you know, I really want to hear your answer to Judge Reed's question because I—just to lay it on the table, I agree with him. Your authority comes from HSPD 12, and the legitimate government interest recited there is secure and reliable forms of identification, and the SPACE Act, which has to do with national security interests. And so once we were—if we were to find that an informational privacy is implicated here, we would expect you to demonstrate how what you're asking the JPL employees to do is narrowly tailored to meeting these legitimate interests. Well, Your Honor, I really do. The directive started—first of all, the directive on its face doesn't have to be read to simply mean identification in the sense of, are you who you say you are in some narrow sense. Let's remember, when you get these—part of the purpose, as the FIPS publication explained, is if you get one of these badges, you can use it not only at—you can use them at any number, not only of NASA facilities, but also at various other federal facilities. And these people, like the claim—I mean, this is— But that's not what the—that isn't what— But the standard is narrowly tailored. Well, no, but, Your Honor, the standard is narrowly tailored to—I mean, there is a government-wide objective to provide consistent reporting on background between government employees and contractor employees who do the same functions, to give people access to physical and logical facilities in the same way. That is as clearly a legitimate government purpose as in case cited by plaintiffs, Barring v. City of New York, in which everybody was—who made under—over $30,000 a year who worked for the city was required to provide a detailed financial disclosure form, which was then made public. I mean, we are so far away in this case from any case recognizing a privacy—constitutional privacy problem. I mean, this is— But what about the questions having to do with drug use? Well, Your Honor, the cases are also fairly clear that a question about illegal actions— I mean, if somebody applies for a job and you say, Have you violated the law in the last year by using illegal drugs? That's not—you don't have—that's not a constitutional violation to ask that question. But what about treatment for drug use? Well, that's a—the question there is really—the question is, have you—it says explain the circumstances, including if you've had treatment, which in part I think is designed to allow people to say, you know, I had a—I have used illegal drugs. I am sort of—I am undergoing treatment. You know, I am suitable. And also let's be clear, this isn't—when the government acts on this and if somebody has a suitability determination that's denied, it's not a mystery about— this isn't something where you don't get told why you were denied it. There is spelled out an appeals process that's—I mean, I can give you the site to it in the record. It's in there. It tells you under the NASA guidelines you're told why it is that you were, if you are, denied a suitability. Has anybody under this program been denied a suitability determination? Plaintiffs have not identified anybody. My question is, has anybody under this program been denied— I don't know the answer to that, but it's plaintiff's burden in seeking a preliminary injunction to demonstrate irreparable harm. Right. So you're arguing that they—that by getting fired— see, we're just looking at whether or not we should enjoin the implementation of all or parts of this program pending a trial on the merits. That's all we're looking at right now. So you're saying that it's—that they would not be irreparably harmed if they were fired during this interim period? Mm-hmm. Or failure to follow the— I mean, first of all, I think that—I mean, there are cases that talk about being, like, the suspensions and so forth are not necessarily irreparable harm, but the irreparable harm that is being focused on here and now, there is nobody who has been— That's not the irreparable harm I'm focusing on because, frankly, I'm not inclined to think that the suitability aspect is really ripe for decision. I'm really looking at the SB 85 and 42 and the written inquiry aspect of this. Right. And if they don't—it's clear in the record if they don't fill out this form, if they hadn't have and we hadn't had to stay, they'd all have been fired. But, Your Honor, you can't—but that's sort of reversing the problem. I mean, the question isn't—the question is, if you fill out the form, what is your irreparable harm? I mean, you can say, well, I don't want to fill it out so that I'm going to be irreparably harmed because I'm going to be fired. But the question— Well, they're irreparably harmed by filling out a form that they think intrudes into their constitutional rights. No, Your Honor. They're irreparably harmed if the form does intrude on their rights. Right. So that's why during the merits we say, okay, you know, we have this sliding scale test where we say, you know, the lowest level are serious questions raised and is there a possibility of irreparable harm? Yes, Your Honor. But you have to—but plaintiffs still, under even—under any standard, the plaintiffs have the burden. And you've got to show—I mean, again, once you focus back on what plaintiffs, the harm that just inures the plaintiffs, just by filling out the form, all that happens, the only real question that they identify there is the drug use question. And that cannot be the basis for their constitutional claim. They're then essentially—what it boils down to is they're asked to provide three references. And the government could have just said, apply three references. We're going to call them. You know, instead it says, provide three references and here's the list of the questions we're going to send. They're written questions. They have little bubbles. The file is in the record. They have little bubbles. You just check them off. So it's much less intrusive. Counsel, you know, it's really much better if you don't distort the record. I have a copy of the form in front of me and it says, is there anything else you're aware of that would adversely affect your opinion of this person? Fill in the blanks. It's not a little checkoff form. Well, excuse me, Your Honor. Most of it is a checkoff. Right. Well, let's just be accurate about what we're talking about. Your Honor, I'm not, of course, trying to distort the record. This material is in the record. My point was that if the government simply conducts a reference check and asks questions, I mean, as people do, you know, just for all sorts of matters, you say, is there anything else I should know about? Is there anything that would call this person's fitness for a job into question? Well, let me just ask about how the government would be irreparably harmed if we did grant this injunction, given that I guess this program has been a possibility for four years and they just started wanting to implement it recently. If we were to grant the injunction and halt the process for the four to six months it would take to get a hearing on the merits, how would the government be irreparably harmed? Well, Your Honor, the answer is this was adopted to affect a real purpose in terms of overall integrity of security. And Your Honor looks askance at that. I'm not looking askance at that. I'm just saying you haven't identified any irreparable harm. Well, Your Honor, the assumption is that this was done to be an appropriate and indeed a necessary thing. Now, the fact that we don't know what could happen like in the next month, maybe, you know, nothing will happen. But it's also unclear, I mean, let's understand, the argument that plaintiffs are making here is a very sweeping one. It goes to matters that are incorporated in the federal acquisitions regulations. Plaintiffs make no bones about the fact that their theory at any rate would apply equally to all the federal employees who are given the form SF85. Their theory that there is imminent irreparable harm merely by filling in this form is one of really extraordinary dimensions. And if one looks at the cases that this Court has decided, I mean, cases like Thorn in which it involved, you know, a lie detector exam, you know, asking like utterly inappropriate questions, you know, about someone's sexual activity. That, you know, that's what we have. We don't have cases from any circuit that remotely resemble this as a privacy matter. And the question about asking third parties about information takes the matter even one step further. Because generally speaking, the privacy cases mostly involve the issue of government redisclosure of information it's obtained. There are some cases that talk about government obtaining extremely personal information that it's not going to redisclose. And those cases, cases like Thorn, involve extremely personal information. Then we take it one step further, and that would be the form itself, which you don't think at all falls into that. And then we've got the question of, well, what if you asked a third person about information about me? Like, would that violate my constitutional privacy rights? And there's nothing that suggests that that could be true. And it's also, there's no evidence that the government has done anything inappropriate in any of these matters. I mean, this form has been around, you know, variations of it have been around for decades. Thousands and thousands of employees have been filling this out, even under the contractor regime. I mean, playoffs really do have some burden, you know, on a PI to go, I mean, do something more than speculate about all of these, you know, sort of things that sound awful, but with no reason to think that they're going to materialize. All we have are a written questionnaire that says, you know, fill out these boxes, and do you have any other information? And a statement that asks you to provide your employment history, your educational history, to list three associates, you know, and a drug use question. Mr. Stern, are we concerned here with whether substantial questions exist on the issues necessary or appropriate for the issuance of a preliminary injunction? That substantial questions exist, I think they do, is that correct? Well, I mean, when the court has to address it, yes, we agree that there are substantial questions. But maybe that's so in almost any case. And then if we say, do the balance of hardships tip decidedly one way or the other, if these people don't comply, they can be fired. If we enjoin them, enjoin the government from doing what it wants to do and get all this information, you wait until you get to a trial. And that's what we really want to determine now is what position should we take pending trial. Well, Your Honor, again, we think that the question right now is whether filling in those forms. Pardon me? Well, the question for right now on a preliminary injunction is whether filling in those forms as such violates a protected constitutional privacy right. I mean, it has to be just filling those out, because consequences down the road. So wait, is it just filling it out? You say it's just filling it out. Or will the government then also send out the questionnaires to the references? Yes, and the sending out of the references. So the gathering of additional information. That's right. But again, the gathering of information from third parties really doesn't fall within any recognized privacy case. It's where it can go and ask questions, you know, on its own, you know, of people. I mean, the government says, you know, here it's said, tell us three people, you know, sort of we can send it out. You get to pick, you know, and it goes out, and it's a written questionnaire. And contrary to plaintiff's stipends, there's no general follow-up. And if there were, that would be in the future and it could be dealt with. I mean, it's an extraordinarily transparent process, and again, there is an appeals process at the end of this. So we know if the government does something that is in any way regarded as inappropriate, this isn't going to escape detection. The government says, here's why you didn't get a suitability determination. You have the opportunity to challenge it, provide additional information, and so forth. You're intruding on... I'm sorry, Your Honor. I've been very generous with my time. There are no more questions. Thank you. Thank you very much, counsel. Mark Holshaw on behalf of Caltech. The government had agreed to give us eight minutes, and I think we're a touch short, and I'll do my best to be as quick as possible here. Before HSPD-12 was enacted, Caltech entrusted each of the plaintiffs to work at JPL without this background check. So do you care whether you're enjoined or not here? We care, Your Honor, because there's no legal basis to enjoin us. But the panel's question is correct, that if the government is enjoined from enforcing HSPD-12 at Caltech, there is nothing in the record to indicate that Caltech would do anything to these plaintiffs. We've made it crystal clear here, Your Honor. We objected to the government's imposition of this new security check. It was unilaterally imposed by the government as an exigent circumstance in our contract. It was unilaterally put in by the government over our objection. There's a Clause 14.G, which I can get for you, if you like, which was specifically saying, over your objection, Caltech, this is in. What you have before you, Your Honors, is a record of decades of Caltech employing the plaintiffs at JPL without this background check and without requiring this badge. Where we are today is the government has said that if our employees are going to work at JPL, they have to have this badge. And, importantly, they can't have logical access to the NASA computer without this badge. The only facts before you, Your Honors, in this record, and I understand that we heard from Plaintiff's Counsel that we could find other jobs for folks, we could give people six months' time, they could work elsewhere. What you have before you, Your Honors, is Ms. Hart's declaration. She's the head of HR at JPL. Paragraph 10, Excerpt of Record 0736. Not disputed by any plaintiff. And that is, we can't operate the lab if our scientists can't work unescorted and they can't access the NASA computer. So the idea that the government can require our staff to get a badge and have them undergo an investigative process we play no role in. We had no role in defining SF-85. The government counsel indicated it's been going on for decades without us. No input in the investigative process. And, in fact, the NASA directive says we can't even know what NASA does to determine our employees' eligibility. It's sort of hard to sort you out from the government here. If the government's going to be restrained, shouldn't you be restrained as well? Well, let me sort you out very directly, Your Honor. We can only be restrained if the plaintiffs can establish a likelihood of success on the merits that Caltech is a government actor that is causing them imminent harm today. The plaintiffs wholly fail, and Judge Thompson, I believe, will be aware of this because he was on the Sutton panel. The plaintiffs in their reply brief at pages 29 through 32 set out for the first time the only legal argument as to why Caltech should be deemed a government actor. Under this court's long line of precedent, the fact that plaintiffs waited until the reply brief on appeal to even assert a basis for Caltech to be deemed a government actor, they've waived it. Now, and I would cite to you, Your Honor, the Independent Towers v. Washington case, which squarely addresses that. So, number one, in their appeal brief for the first time, three pages, Caltech can be deemed a government actor. And what do they cite to support that? Remember, there's no basis to enjoin us unless they find a likelihood of success on the merits against us or serious questions and irreparable harm. They have no claim against Caltech. Can I just ask, okay, so you have a contract with NASA, and NASA has imposed unilaterally a contract provision that requires the implementation of this program. Now, if we enjoin NASA, would you be in breach of your contract with NASA by not complying with the provision that's actually in your contract? No, Your Honor, I think the Ninth Circuit trumps, because you've stated what we have to do. If our scientists don't need to get badges, we're happy to have them continue working unless it's part of the requirements being enforced at the lab. But what I'm saying is, would NASA pull your contract? I believe the answer is no, they haven't pulled our contract yet. And I think, Your Honor, what I would say to you is, we will take care of that issue with NASA. I would not want that to be used to bootstrap an incorrect imposition of injunction against us when there's no claim against us. So if they were to sue you for breach of contract, or if they were to yank your contract, you'd sue them, and we'd say the Ninth Circuit's issued an injunction against you, so we're not in breach. Your Honor, I'm not worried about that. What I'm worried about is, we're a private actor. We respect our scientists. They've worked with us for decades. This is a very tumultuous situation. The plaintiffs' counsel, in a reply brief, for the first time, have raised an argument that we're a government actor. The law doesn't permit it. The Sutton case made clear, Your Honor, you were on that panel, that unless it's a joint activity in which the private actor is involved with the government, the private actor cannot be subject to constitutional claims. It can't be joint, willful activity when we objected to it and it was put in the contract over our objection. Moreover, it can't be joint activity when the NASA interim directive says we can't participate. We can't even know. If down the road any of our scientists are denied a badge, the NASA interim directive, and I point your attention to Executive Record 0933, and look at paragraph 6 and 13.12, we are prohibited from even knowing what the government does in its investigation. We can't know who they talk to. We can't know what documents they've received. If the contract requires you to do certain things, how are you going to get out of that unless you're restrained? The contract is telling you you've got to do these things. If the court rules that our scientists in the next six months can work at JPL without a badge, they'll do what they're doing right now, which is, remember, the... Are you not going to follow the contract? We are not going to follow the contract. Because I believe that contract provision will have been superseded by the order of this court. And again, Your Honor, I think that the issue is here. At this moment... So for the record here, you will not follow the contract if the government is restrained? For the record here, Your Honor, if the court rules that in the interim period our scientists do not need a badge, Caltech will not be saying that they have resigned because the reason why, and it's in the correct heart declaration in paragraph 10, is that we can't operate the lab if people can't have access to the computers and if they can't have unescorted access to their office. If this court were to join the government, there is no risk of any of our employees being deemed to have resigned. But the most important point, Your Honor, is you can only issue an injunction if there's a legal basis for issuance of it. And as it relates to Caltech, and I want to briefly touch on the Mathis case, which plaintiffs cite. Mathis is the only case in the Ninth Circuit that found a private party to be a government actor in anything close to this. And what plaintiffs do in their reply brief is they say, these cases are in all fours with Mathis. In Mathis, what happened is PG&E conducted an investigation of their contractor. They did an undercover drug sting. Then PG&E interrogated the contractor. And then PG&E fired them. All with the encouragement of the Nuclear Regulatory Commission. And, Your Honor, in Sutton, you describe this in great detail. Plaintiffs omit those facts from their brief. The only case where a private entity has been found to be a government actor is where they did the investigation, they did the interrogation, and they did the termination. That would include us doing everything we are prohibited under the NASA directive we know about. So there is no basis to enjoin Caltech because there's no possibility of the plaintiffs prevailing. And there's no potential... It seems like you're in joint activity with the government. You've got a contract. You're carrying out their requirements. You're doing their job. It feels like it's a joint activity with the government. It's a good question. Your question on the joint activity, however, has to be the unconstitutional activity or the activity that potentially violates the rights. Of course we're working with the government on all the NASA programs. But what Sutton makes clear and Mathics makes clear is that the joint activity to support an injunction to find someone to be a state actor must be the activity that violates the Constitution, the form you're worried about, which, as you know, we have nothing to do with. And I will finish with this, Your Honor. We can't be deemed of willfully participating in joint activity that was done over our objection. There's no basis in law. There's no basis to enjoin us. And we, of course, if the Court enjoins NASA, our scientists will continue to work as they've worked at JPL for decades. Thank you, Your Honor. Thank you very much, counsel, all counsel, for an excellent argument. The session of the Court is adjourned for today. All rise. This call for the session is adjourned.
judges: Thompson, Wardlaw, Reed